UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 6:25-CR-10-REW-HAI |
| v. | ) | |
| | ) | |
| KATELYNN NICHOLE BOATRIGHT, | ) | OPINION & ORDER |
| *also known as* Katie Boatright, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

In two separate motions, Defendant Katelynn Nichole Boatright moves to suppress all evidence seized from a Tennessee traffic stop that occurred on December 2, 2024. *See* DE 25; DE 26. In her first motion, Boatright argues that police relied on a facially deficient warrant to place a tracking device on her car and collect evidence that ultimately prompted the traffic stop. *See* DE 25 at 6–7. In her second motion, Boatright argues that police unreasonably delayed the traffic stop, securing proof in violation of her rights. *See* DE 26 at 4–5. The Court referred suppression proceedings to United States Magistrate Judge Hanly A. Ingram. *See* DE 36. After conducting two evidentiary hearings, *see* DE 54; DE 59, Judge Ingram recommended that the Court deny both motions, determining that the warrant was not constitutionally deficient, *see* DE 58 at 6–11, and that the traffic stop had a lawful duration, *see* DE 60 at 7–10.[1]

---

[1] The record before Judge Ingram included all of the briefing (DE 25, DE 26, DE 32, DE 33, DE 34, and DE 35). The exhibits included the GPS tracking warrant, the affidavit used to obtain that warrant, the data that police relied upon to justify the traffic stop, and all relevant police reports (DE 25-1, DE 25-2, DE 25-3, DE 25-4, DE 25-5, DE 25-6, DE 25-7, DE 26-1, DE 26-2, and DE 26-3). The transcript of the hearings are at DE 54 and DE 59. This Court has read and considered all of the paper, including the objection exchanges. The remaining legal disputes are essentially whether the initial warrant used to install the tracker was constitutional, and whether the traffic stop was unconstitutionally prolonged.

Boatright timely and particularly objected to each of Judge Ingram's recommendations. *See* DE 61; DE 62. The Government responded to both sets of objections in a single filing. *See* DE 64. On Boatright's first motion, the Court finds the warrant invalid. However, the Court will not decide whether the good faith exception spares exclusion until it receives further briefing from the parties. On Boatright's second motion, the Court, after conducting a de novo review, adopts with modifications Judge Ingram's recommendation. The Court adjudges no infirmity in the temporal aspects of the stop. As such, in substance, the Court **OVERRULES** Boatright's second set of objections, DE 62, **ADOPTS**, on terms, Judge Ingram's second recommendation, DE 60, and **DENIES** Boatright's second suppression motion, DE 26.

## I.    BACKGROUND

On November 15, 2024, a judge in Bell County, Kentucky issued a search warrant authorizing the installation of a GPS tracking device on Katelynn Nichole Boatright's 2013 Chevrolet Camaro.[2] *See* DE 25-2. Accompanying the warrant was an affidavit stating that two controlled methamphetamine buys had recently occurred between Boatright and law enforcement. *See* DE 25-1 at 2. The affidavit also highlighted the frequent short-term visitors that Boatright received in her home, along with her repeated and brief trips away from the residence. *See id.* The affiant indicated that, in his experience, Boatright's behavior was consistent with that of a drug trafficker. *See id.*

The warrant authorized the installation of a tracking device on Boatright's vehicle, but it did not specify a deadline for installation or the duration of warranted monitoring. *See* DE 25-2. The parties do not dispute probable cause. A law enforcement officer with the Kentucky State

---

[2] Boatright has not objected to any of Judge Ingram's factual findings. *See* DE 61; DE 62. As such, the Court adopts Judge Ingram's well-reasoned conclusions as to the underlying facts of this dispute. *See* DE 58; DE 60.

Police installed the device on November 21, 2024, six days after the warrant issued, at the Middlesboro mall parking lot. *See* DE 54 at 16, 72. The device remained active until Boatright was stopped on December 2, 2024. *See id.*

Tracking data showed that on December 1, 2024, Boatright's Camaro traveled from Kentucky to Atlanta, Georgia. *See id.* at 25. On belief that Boatright might have been transporting drugs, Kentucky State Police alerted the Claiborne County, Tennessee Sheriff's Office that the vehicle would be returning through their county. *See id.* at 21, 60. The next day, an automated license plate reader alerted to the Camaro's presence in the county. *See id.* at 30. Upon learning that Boatright had an outstanding arrest warrant for methamphetamine trafficking from 2019, local officers conducted a felony traffic stop of the vehicle. *See id.* at 32–33. Boatright was sitting in the passenger seat, and two men were also present in the vehicle. *See id.* at 49.

Once Boatright was removed from the vehicle and police began the arrest process, officers observed a pistol in plain view on the passenger-side floorboard. *See id.* at 33–34. Boatright then admitted to having cocaine in her pocket; a search incident to arrest subsequently revealed both cocaine and psychoactive mushrooms on her person. *See id.* at 33. A K-9 unit proceeded to conduct an exterior sniff of the vehicle and alerted three times. *See* DE 26-2. Believing they had probable cause to do so, the officers then searched Boatright's vehicle and discovered three firearms, drug paraphernalia, and a large quantity of suspected methamphetamine in the trunk. *See id.*; DE 26-4; DE 54 at 36. A federal grand jury subsequently indicted Boatright for "conspir[ing] with others to knowingly and intentionally distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846." DE 1.

On May 7, 2025, Boatright filed two motions to suppress.  In her first motion, she argues that the GPS tracking warrant was constitutionally deficient because it failed to include temporal limitations, *see* DE 25 at 6–7, that the good faith exception could not apply due to the warrant's facial deficiencies, *see id.* at 7–8, and that police impermissibly invaded the curtilage of Boatright's home in order to install the tracking device, *see id.* at 8–9.  In her second motion, she argues that police searched the trunk of her vehicle without probable cause, as they began the search prior to the three K-9 alerts, *see* DE 26 at 4, and that the stop was unconstitutionally prolonged after the completion of her arrest, *see id.* at 4–5.

After holding two suppression hearings, *see* DE 46; DE 55, Judge Ingram recommended that the Court deny both motions.  *See* DE 58; DE 60.  Boatright objects to those recommendations, preserving two main arguments:  (1) police relied on a facially deficient warrant that lacked temporal limitations to place and to operate the tracking device on her vehicle, *see* DE 61; and (2) police unconstitutionally prolonged the traffic stop, improperly conducting the fruitful search, *see* DE 62.  Boatright has now conceded that the tracking device was installed while her car was on public property, and that the K-9 alerted prior to the search of her trunk.  *See* DE 61 at 1; DE 62 at 1.  The Government responded in opposition to both of Boatright's objections.  *See* DE 64.  The matter, on a fulsome record, is now ostensibly ripe for review.

## II.    LEGAL STANDARD

When a party timely objects to a magistrate judge's dispositive recommendation, the Court must make "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C); *see also* FED. R. CRIM. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation.").  The Court "may accept, reject, or modify, in whole or in part, the

findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). However, the Court need not "review . . . a magistrate[ judge]'s factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 106 S. Ct. 466, 472 (1985).

When seeking suppression in the context of a warranted search, the defense typically bears the burden of proof. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003). That is, the defendant must provide evidence of "a violation of some constitutional or statutory right justifying suppression." *Id.* (citing *United States v. Feldman*, 606 F.2d 673, 679 n. 11 (6th Cir. 1979)). Importantly, the substantive issues determine burden allocation. *See, e.g.*, *United States v. Johnson*, 482 F. App'x 137, 143 (6th Cir. 2012) ("Ultimately, '[i]t is the [Government's] burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" (quoting *Florida v. Royer*, 103 S. Ct. 1319, 1326 (1983))).

## A. The Fourth Amendment Warrant Requirement

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Searches conducted without a valid warrant "are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 88 S. Ct. 507, 514 (1967). A warrant is valid when issued "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

The probable cause inquiry is a flexible one: "Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the magistrate's

decision." *Illinois v. Gates*, 103 S. Ct. 2317, 2330 (1983). While probable cause requires more than mere suspicion, it does not require prima facie proof. *See United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016). So long as the totality of the circumstances indicates that there is a fair probability of contraband or evidence of a crime being found at a particular place, there exists probable cause. *See Gates*, 103 S. Ct. at 2328 ("This totality-of-the-circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific 'tests' be satisfied . . . ."); *see also United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008).

However, even when issued upon adequate probable cause, a warrant may still be constitutionally deficient if it fails to describe the place to be searched or things to be seized with particularity. *See Groh v. Ramirez*, 124 S. Ct. 1284, 1289–93 (2004) (holding that a search warrant was facially invalid because it utterly failed to describe the persons or things to be seized). Such warrants are akin to general warrants, "the immediate evil[] that motivated the framing and adoption of the Fourth Amendment." *Payton v. New York*, 100 S. Ct. 1371, 1378 (1980). In analyzing whether a warrant is sufficiently particularized, courts are limiting to examining the "four corners" of the warrant and any other incorporated documents. *Abernathy*, 843 F.3d at 249. The degree of specificity required to satisfy the particularity requirement is flexible, and it will necessarily "vary depending on the crime involved and the types of items sought." *United Sates v. Hanna*, 661 F.3d 271, 286 (6th Cir. 2011).

Any search conducted pursuant to a constitutionally deficient warrant necessarily violates the Fourth Amendment, unless one of the specifically established exceptions to the warrant requirement applies. *See Katz*, 88 S. Ct. at 514. When evidence is obtained pursuant to an unconstitutional search or seizure, the exclusionary rule generally forbids the use of that evidence at trial. *See Herring v. United* States, 129 S. Ct. 695, 699 (2009). The rule similarly extends to

evidence *derivatively* obtained from an unconstitutional search or seizure under what is known as the "fruit of the poisonous tree" doctrine. *See United States v. Galaviz*, 645 F.3d 347, 354 (6th Cir. 2011) (citing *Wong Sun v. United States*, 83 S. Ct. 407, 417 (1963)). Notably, the Supreme Court has incorporated the protections of the Fourth Amendment, including the exclusionary rule, against the states and state officials. *See Elkins v. United States*, 80 S. Ct. 1437, 1447 (1960); *Mapp v. Ohio*, 81 S. Ct. 1684, 1691–94 (1961).

But the exclusionary rule will not automatically or categorically apply to any evidence that was obtained as a result of an unconstitutional search or seizure. Through its exclusionary rule jurisprudence, "[t]he Supreme Court has effectively created a balancing test by requiring that in order for a court to suppress evidence following the finding of a Fourth Amendment violation, 'the benefits of deterrence must outweigh the costs.'" *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010) (quoting *Herring*, 129 S. Ct. at 700). Moreover, in *United States v. Leon*, 104 S. Ct. 3405, 3416–19 (1984), the Supreme Court explicitly held that, in most instances, an officer's good faith reliance on a defective search warrant will counsel against application of the exclusionary rule since suppression there would serve no deterrent purpose. The *Leon* Court did, however, articulate a non-exhaustive list of scenarios in which an officer's reliance on a warrant would not avoid exclusion, one being when the warrant is "so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Id.* at 3421.

As a final aside, while federal warrants are subject to the Federal Rules of Criminal Procedure, state warrants are not. *See United States v. Hopper*, 58 F. App'x 619, 628 (6th Cir. 2003) ("[A]lthough the police failed to comply with [federal] procedural requirements . . . , the search was nevertheless 'reasonable' in the constitutional sense, because it was conducted pursuant

to a valid state warrant and met the requirements of the Fourth Amendment."). Thus, even though Rule 41(e)(2)(C) mandates the installation of tracking devices "within a specified time no longer than 10 days," and permits tracking for a "reasonable length of time" that may not "exceed 45 days from the date the warrant was issued,"[3] states are free to impose different requirements on their own courts, all subject to constitutional limits. Although Kentucky courts are bound by the Kentucky Rules of Criminal Procedure, those rules do not address tracking devices distinctly. They do not mandate a specific range of time in which tracking devices must be installed, nor do they set limits on the overall period that a tracking device may be used. *See* KY. R. CRIM. P. 13.10.

### B. Traffic Stops and Automobile Exception to the Warrant Requirement

Because traffic stops are seizures within the meaning of the Fourth Amendment, they must be conducted in a reasonable manner. *See Whren v. United* States, 116 S. Ct. 1769, 1772 (1996). A traffic stop is reasonable when there exists "probable cause to believe that a traffic violation has occurred," *Id.* (citing *Delaware v. Prouse*, 99 S. Ct. 1391, 1399 (1979); *Pennsylvania v. Mimms*, 98 S. Ct. 330, 332 (1977) (per curiam)), or "reasonable suspicion of an ongoing crime," *United States v. Collazo*, 818 F.3d 247, 254–55 (6th Cir. 2016). But that is not to say that traffic stops can persist indefinitely – an otherwise-completed traffic stop may not be extended beyond the catalyzing mission absent some ongoing, reasonable suspicion that criminal activity is afoot. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1614, 1616 (2015) (describing the proper grounds for extending traffic stops and analogizing to *Terry* stops).

While "reasonable suspicion" entails less certainty than "probable cause," reasonable suspicion is similarly reliant on the totality of the circumstances. *See United States v. Arvizu*, 122 S. Ct. 744, 751–52 (2002) (citing *United States v. Cortez*, 101 S. Ct. 690, 694–95 (1981)) ("When

---

[3] Unless there exists good cause for one or more extensions. *See* FED. R. CRIM. P. 41(e)(2)(C).

discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."). When determining whether reasonable suspicion exists, officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *See id.* at 750–51 (quoting *Cortez*, 101 S. Ct. at 695).

During a lawful traffic stop, police may conduct a search of the stopped vehicle without a warrant so long as there is probable cause to believe that evidence of criminal activity will be found in the vehicle. *See Collins v. Virginia*, 138 S. Ct. 1663, 1669 (2018) (citing *Carroll v. United States*, 45 S. Ct. 280 (1925)). This "automobile exception" to the warrant requirement is based on the simple reality that a "vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *United States v. Hall*, 20 F.4th 1085, 1099 (6th Cir. 2022) (quoting *Carroll*, 45 S. Ct. at 285).

## III.   ANALYSIS

Boatright raises two arguments. First, she asserts that the state warrant authorizing the placement of a tracking device on her car was unconstitutional because it lacked temporal limitations, and the absence of those limitations amounted to a facial deficiency obviating application of the good faith exception. *See* DE 25 at 6–8. Second, she contends that police continued the traffic stop after the mission of the stop had been completed, violating her Fourth Amendment rights pursuant to *Rodriguez*. *See* DE 26 at 4–5.

### A.  GPS Tracking Warrant and the Good Faith Exception

While the warrant provided police with sufficient guidance on the installation of the tracking device, its failure to limit the duration of tracking renders it unconstitutional.  But instead of determining whether suppression is appropriate at this time, the Court directs additional briefing from the parties on whether the good faith exception should apply.

#### 1.  Constitutionality of the GPS Tracking Warrant

Boatright contends that the GPS tracking warrant was unconstitutionally overbroad, and that all evidence obtained pursuant to that warrant – including the derivative evidence gathered at the resulting traffic stop – should be suppressed.  *See* DE 25 at 6–8, 9–11.  In support of her argument, Boatright cites two deficiencies in the warrant:  (1) its failure to specify the particular period during which police could install the tracking device; and (2) its failure to specify the length of time over which GPS tracking could occur.  *See id.* at 6.  Judge Ingram ultimately determined that neither of these deficiencies rendered the warrant unconstitutional, *see* DE 58 at 12, and Boatright objects to that determination, *see* DE 61 at 7–14.

Boatright is essentially claiming that the GPS tracking warrant was akin to a general warrant.  Prior to the founding, the notorious "general warrant" was ubiquitous; these warrants "specified only an offense . . . and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched." *Steagald v. United* States, 101 S. Ct. 1642, 1651–52 (1981).

With respect to the GPS tracking warrant's failure to specify the period during which police could install the tracking device, Boatright's argument is not persuasive.  Police were afforded sufficient guidance, within the warrant, on when to conduct the installation, and the failure to define a specific period in which to install the device did not transform the GPS tracking warrant

10

into a general warrant. However, the warrant's failure to specify the length of time over which GPS tracking could occur is significantly more concerning. While that failure alone may not be enough to make this warrant a general warrant, under particularity concepts, it is certainly enough to render the warrant unconstitutional under Sixth Circuit binding authority.

### i.    Failure to Include a Temporal Limitation for Installation

The Court agrees with Boatright that the warrant failed to identify a particular period during which police were required to install the tracking device. *See* DE 25-2 at 1. But that fact does not imply, as she argues in her objections, that police lacked any guidance on when to install the device. *See* DE 61 at 2. To the contrary, the warrant expressly commanded police to act immediately. *See* DE 25-2 at 1 ("[Y]ou are commanded to make immediate search of the premises . . . .").

Of course, police waited six days to install the device. They did not take "immediate" action, in the temporal sense. However, authorities could not act against the vehicle when parked within Boatright's curtilage – the warrant did not authorize entry into that area (as Boatright's now-abandoned curtilage theory notes, *see* DE 25 at 8–9). When authorities, within six days, received information that Boatright was traveling toward Middlesboro, they tailed her vehicle to a public parking lot, where they lawfully installed the device. *See* DE 54 at 16–17. In summary, the warrant *did* provide guidance to police, and Boatright has not established that police failed to comply reasonably with that guidance. Prompt *lawful* installation suffices to adhere to the direction of immediate installation.

### ii.    Failure to Include a Temporal Limitation for Tracking

Neither party has identified controlling authority on the issue of whether a warrant's failure to specify the permissible duration of tracking will render it unconstitutional. *See* DE 61 at 8;

11

DE 64 at 7.  For that reason, Boatright supports her motion by citing three analogous cases.  *See* DE 61 at 7–9.  However, these cases are not as "directly on point" as she claims.  *See id.* at 9.

Boatright begins by citing *United States v. Ford*, 184 F.3d 566 (6th Cir. 1999).  *See* DE 61 at 7–8.  Specifically, she references the court's statement that the "[f]ailure to limit broad descriptive terms by relevant dates, when such dates are available to police, will render a warrant overbroad."  *Id.* at 576.  But the *Ford* decision involved the search of a bingo hall and the seizure of documents that were more than a decade old – many of which were created before the owner of the bingo hall and the subject of the gambling investigation even purchased the relevant business.  *See id.* at 571–73; *see also United States v. DSD Shipping, A.S.*, No. 15-00102, 2015 WL 5164306, at *8 n.9 (S.D. Ala. Sept. 2, 2015).  The court took issue with the warrant's failure to identify the specific documents subject to seizure by reference to their creation date.  *See Ford*, 184 F.3d at 576–77.  But the present matter is factually distinct in that the GPS tracking warrant only authorized the seizure of a single, particularized type of data.  While the warrant failed to specify the permissible duration of tracking, it did not create any ambiguities as to what data could be collected.  In that regard, the *Ford* decision is about a different issue.

This criticism also applies to the other cases, *United States v. Abboud*, 438 F.3d 554 (6th Cir. 2006), and *United States v. Abrams*, 615 F.2d 541 (1st Cir. 1980), that Boatright cites in her objections.  *See* DE 61 at 9.  Each of those cases also involved a warrant authorizing the seizure of physical documents without limiting that authorization to records that were created within a specific time frame.  *See Abboud*, 438 F.3d at 561–62, 576; *Abrams*, 615 F.2d at 543–45.  Neither decision stands for the proposition that GPS tracking warrants failing to limit the permissible duration of tracking are automatically invalid.

Moreover, there are important distinctions between warrants authorizing the collection of digital data and warrants authorizing the collection of physical documents. Existing case law acknowledges these differences and suggests that there are legitimate reasons for courts to vary their treatment of these separate warrants. *See, e.g.*, *United States v. Chandler*, 571 F. Supp. 3d 836, 843 (E.D. Mich. 2021) (citing *Riley v. California*, 143 S. Ct. 2473, 2491–93 (2014)) ("The Supreme Court recognized the impracticality of directly comparing searches for digital data to searches for items in the physical world."). To put it simply, the Court does not view *Ford*, *Abboud*, and *Abrams* as dispositive here.

But despite the parties' contentions and their failure to mine for precedent successfully,[4] there is controlling authority to address. In *United States v. Bailey*, 628 F.2d 938, 945–46 (6th Cir. 1980), the Sixth Circuit determined that a warrant authorizing the use of a beeper device, to track a chemical container, was invalid because it failed to limit the overall duration that the beeper could be monitored. Of course, one could argue that *Bailey* is distinguishable from the present matter, as the beeper at issue in *Bailey* was monitored for 70 days, *see id.* at 945, while the tracking device at issue here was monitored for 11 days. However, the *Bailey* court, after conducting a "search" analysis, made clear that "[b]ecause the warrant permitted surveillance of the movements of defendants for an indefinite period of time, it authorized an unreasonable search, and, therefore, was invalid." *Id.* In other words, the overall length of the search was irrelevant to constitutionality – all that mattered was the fact that the warrant authorized tracking for an indefinite period. *Bailey*, never overruled, stands for the proposition that warrants authorizing tracking without stated durational limitations violate the Fourth Amendment. Using that logic, the GPS tracking warrant issued in the instant matter was unconstitutional.

---

[4] And really, the search involved both counsel, defense counsel's consultation with a broad defense bar pool, and the highly effective offices of Judge Ingram.

In his opinion, Judge Ingram suggested that even if the warrant was overbroad, the infirm portions of the GPS tracking warrant were severable because the search, in fact, was conducted in a reasonable manner. *See* DE 58 at 8. Boatright objects to that conclusion, stating that it is impossible to "distinguish any part of the warrant that may be valid from any part that is not" without implying an arbitrary, post hoc time limitation into the text of the warrant. *See* DE 61 at 11. The Court agrees with Boatright. In evaluating the constitutionality of a warrant, courts are generally limited to considering the four corners of the document. *Abernathy*, 843 F.3d at 249. Reading an implied or as applied limitation into a warrant after the search it authorized has already been completed would violate that command. Additionally, *Bailey*'s mandates would have little meaning if courts later employed such tools in weighing validity – in fact, the *Bailey* court specifically contemplated this dilemma, noting that "the fact that the surveillance lasted seventy days rather than many months [did not] render the omission [of the temporal limitation] harmless." 628 F.2d at 945 n.12 (citing an exemplar analysis where invalidity existed despite only 13 days of interception under a temporally overbroad and blanket 60-day warrant and statute). The implication of this language is that the omission of a temporal limitation causes constitutional harm, irrespective of whether the search itself was conducted in an otherwise reasonable manner. The Sixth Circuit elaborated on this position, holding:

> In our view, the issuance of a search warrant without a termination date seriously undermines the very [F]ourth [A]mendment interests the search warrant requirement is designed to protect. To hold that a "beeper warrant" passes constitutional muster despite the absence of a termination date would exalt law enforcement needs over rights of individual privacy. Requiring that beeper surveillance warrants contain time limitations is not too high a price to pay for the protection of citizens from the invasion of privacy inherent in having their every movement followed by an electronic "eye."

*Id.* at 946.

14

On account of the preceding analysis, and seeing no discernible space between today's tracking device and the beeper addressed in *Bailey*, the warrant's failure to limit the overall duration of tracking must necessarily render it unconstitutional. A proper temporal limitation would have cabined police discretion and ensured a narrow and reasonable intrusion upon Boatright's rights. *Bailey*'s categorical approach renders inapplicable the severance principles that often might salvage portions of an otherwise overbroad warrant.

### 2. Applicability of the Good Faith Exception

Because neither party discussed *Bailey* or its implications in their filings, the Court requires additional briefing on whether the good faith exception applies to police reliance on a constitutionally deficient GPS tracking warrant. This is the only remaining issue. The following analysis should guide the parties in their briefing.

Exclusion is a proper remedy only when the benefits of deterrence outweigh its heavy costs. *Master*, 614 F.3d at 243. To reiterate, the exclusionary "rule's sole purpose is to deter police misconduct." *United States v. Sanders*, 106 F.4th 455, 467 (6th Cir.), *cert. denied*, 145 S. Ct. 603 (2024).[5] Thus, the Court must determine whether suppression would deter misconduct, and to what degree. In his recommendation, Judge Ingram suggested that the exclusionary rule would serve no deterrence purpose in the present case. *See* DE 58 at 11–13. Boatright objects, taking the position that "the good faith exception does not apply [to prevent the application of the

---

[5] Notably, the *Bailey* court applied the exclusionary rule based on the fact that "electronic surveillance has such a potential for abuse that the Government must be held accountable for its use." 628 F.2d at 947. However, the fact that *Bailey* was decided four years prior to *Leon* certainly renders the continuing vitality of this specific analysis suspect, especially given that the *Leon* decision is typically credited with creating the good faith exception. *See, e.g.*, *Toward a General Good Faith Exception*, 127 HARV. L. REV. 773, 775–76 (2013). Plainly, *Bailey* did not apply anything approaching the contemporary exclusionary rule. While *Bailey* directly rejected the idea of a good faith carve out and applied instead principles of judicial integrity, *see* 628 F.2d at 947, the Sixth Circuit's modern treatment of the exclusionary rule is entirely reliant on whether exclusion would deter police misconduct, *see Sanders*, 106 F.4th 455, 467.

exclusionary rule] because the warrant is so facially deficient that the executing officer's reliance on the warrant was neither in good faith nor objectively reasonable." DE 61 at 12.

Some of Boatright's arguments lack traction. Boatright first asserts that "the exclusionary rule simply does not apply to overbroad warrants that violate the Fourth Amendment particularity requirement." *Id.* However, Boatright has not provided adequate support for that sweeping declaration. While Boatright cites *Groh*, 124 S. Ct. at 1294, that case is not as helpful as she claims. *See* DE 61 at 12. In *Groh*, the Court affirmed an application of the exclusionary rule because "[n]o reasonable officer could claim to be unaware of the basic rule . . . that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." 124 S. Ct. at 1294. But that rule is a bedrock principle of Fourth Amendment law that has been "well established by [the Supreme Court's] cases." *Id.* The principle that GPS tracking warrants must, as a constitutional principle, limit the permissible duration of tracking perhaps is not similarly "well established."

Likewise, Boatright's citation to *Lo-Ji Sales, Inc. v. New York*, 99 S. Ct. 2319, 2326 (1979), is inapposite. In her objections, Boatright notes that the *Lo-Ji Sales* Court excluded evidence that had been obtained pursuant to a deficient warrant because the warrant "left it entirely to the discretion of the officials conducting the search to decide what items were likely [to be relevant evidence] and to accomplish their seizure." DE 61 at 14 (quoting *Lo-Ji Sales*, 99 S. Ct. at 2324). But just as *Ford*, *Abboud*, and *Abrams* are insufficiently analogous to the present matter, so too is *Lo-Ji Sales*. While the warrant at issue in *Lo-Ji Sales* provided police with nearly unfettered discretion, *see* 99 S. Ct. at 2324, the warrant at issue in the instant matter imposed strict limits on the type of data that police were permitted to collect and defined the exact method of collecting

that data.[6]  The mere fact that the GPS tracking warrant failed to include a temporal limitation does not bring it within the ambit of *Lo-Ji Sales*.

Still, Boatright raises a potentially weighty argument under *Leon*.  *See* DE 61 at 12–13.  Boatright contends that the GPS tracking warrant was so facially deficient that no reasonable officer could have relied upon it.  *See id.* at 12; *Leon*, 104 S. Ct. at 3421.  Of course, the warrant was not *wholly* deficient.  It described Boatright's alleged criminal activity, detailed the particular data to be collected, and identified the precise method of collecting that data.  *See* DE 25-2 at 1.  Clearly, the GPS tracking warrant was a far cry from the prototypical general warrant.  Nevertheless, the warrant was facially deficient in one respect – it failed to impose a temporal limitation on the duration of GPS monitoring.

Whether that facial deficiency categorically precludes application of the good faith exception is left to the parties to brief.  The parties should examine how courts have treated "facially deficient" warrants in applying *Leon* and its progeny.  They should also bear in mind that exclusion is, per the cases, only appropriate where it would meaningfully deter culpable police conduct.  *See United States v. Davis*, 131 S. Ct. 2419, 2429 (2011) (recognizing the Court has never applied "the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct").  As it currently stands, the Court struggles to see how suppressing the evidence obtained pursuant to the deficient warrant – or the fruits of that evidence – would serve a deterrent purpose.  A Bell County judge independently issued the warrant upon a proper finding of probable cause.  Police approached Boatright's vehicle while it was on public property, not her protected curtilage.  They installed the tracker soon after the warrant issued.  And they monitored

---

[6] It is also notable that *Lo-Ji Sales* involved much more extreme facts.  There, the judicial officer authorizing the search warrant "bec[a]me a member, if not the leader, of the search party which was essentially a police operation."  99 S. Ct. 2324.  The fact that he abandoned his "neutral and detached" position as a judicial officer was what caused the Court the most concern.  *See id.* at 2325.

the tracker for a narrow period of time.  In executing the warrant, police acted in a reasonable manner.

Of course, Boatright can argue that the police's reliance on a warrant that did not comply with *Bailey*'s requirements is deterrable misconduct in and of itself.  But it is important to recall, as Boatright points out in her objections, that there is no Kentucky law that requires a stated limit on the period of time that police can monitor a GPS tracking device after a warrant is issued.  *See* DE 61 at 8.  As such, it would set a high bar to say that police were on notice – or should have been on notice – about the unlawfulness of the state warrant.  If two highly trained lawyers and a veteran federal judge were unaware of and unable to find *Bailey*, and if Kentucky's warrant procedures contain no explicit temporal requirement, one may conclude that it would be a tall task for the Court to reasonably impute awareness of that esoteric limit to a Kentucky State Police trooper.

With that being said, the Court recognizes that certain authorities suggest it is impossible to rely on a facially invalid warrant in good faith.  *See, e.g.*, *United States v. Bateman*, 945 F.3d 997, 1005 (6th Cir. 2019) ("Notwithstanding [the good faith] exception, an officer still 'cannot reasonably presume' that a 'facially deficient' warrant is valid. . . .  Evidence obtained as a result of a facially invalid warrant cannot be admitted pursuant to the 'good faith' exception."  (internal citation omitted) (quoting *Leon*, 104 S. Ct. at 3421)); *United States v. Lazar*, 604 F.3d 230, 237–38 (6th Cir. 2010) ("Despite the government's argument to the contrary, [Supreme Court precedent] does not purport to alter that aspect of the exclusionary rule which applies to warrants that are facially deficient warrants *ab initio*.").  But this principle is not universally applied in the relevant law.  *See, e.g.*, *United States v. Cassity*, 807 F.2d 509, 512 (6th Cir. 1986) (citing *Massachusetts v. Shepherd*, 104 S. Ct. 3424, 3429 (1984)) ("The warrants were not facially invalid

18

and the district court did not err in holding that it was reasonable for the police officers to install and monitor beepers after securing warrants that contained no time limits. The error in the case was committed by the magistrates in issuing the warrants, not by the police officers in executing them.").

The parties' briefing, which earlier did not discuss *Bailey*, should focus on whether *Leon* applies to the warrant, given its fatal but atypical flaw.

### B.  Prolongation of the Stop Beyond Original Mission

Boatright objects to Judge Ingram's conclusion that "there is no evidence to suggest the stop was unconstitutionally delayed." DE 60 at 10. Specifically, Boatright argues that "the traffic stop was unlawfully extended for two or three minutes to permit the dog sniff." DE 62 at 5. She further asserts that police should have instead "arrested [her] and left the car on the side of the road or impounded it if permitted by policy." *Id.* However, a careful review of the record suggests that any delay was justified by the officers' reasonable suspicion of criminal activity. Therefore, the delay did not violate the basic tenets of the *Rodriguez* decision. 135 S. Ct. at 1615–16. Accordingly, the Court overrules Boatright's second set of objections.[7]

Both parties agree that the initial mission of the traffic stop was to arrest Boatright; she faced an outstanding local warrant. *See* DE 62 at 5; DE 64 at 9. Furthermore, the parties agree that after Boatright was arrested, the officers continued the stop and deployed a K-9 to sniff around the vehicle. *See* DE 62 at 5; DE 64 at 8–9. Finally, it is uncontested that after the K-9 gave three positive alerts, the officers had probable cause to conduct a search of the vehicle. *See* DE 60 at 6;

---

[7] One wonders how Boatright would benefit, if authorities had done what she said. If they had simply put her in the squad car and driven her off, the vehicle would have been left on the road or impounded. Obviously, officers could, with no constitutional problem, run a drug dog around a car left sitting on the roadside after the owner has lawfully been taken to the station. No delay or constitutional dimension would arise. There simply is no harm caused by authorities not doing what Boatright claims they should have.

DE 62 at 1.  The parties only diverge as to whether some new mission justified the continuation of the traffic stop.

As Judge Ingram recognized in his recommendation, two critical pieces of evidence afforded police reasonable suspicion that criminal activity was afoot after Boatright's arrest.  First, the officers discovered multiple illicit substances on Boatright's person, after they removed her from the vehicle.  *See* DE 60 at 7–8.  Second, a loose firearm was seen in plain view near the passenger seat of the vehicle during Boatright's arrest.  *See id.* at 8.  In her objections, Boatright argues that this evidence did not establish reasonable suspicion sufficient to justify the continuation of the stop.  *See* DE 62 at 5–7.  Boatright's arguments are unpersuasive.

Boatright claims that the drugs found on her person did not create reasonable suspicion that other drugs would be found in her vehicle.  In support, she raises several points:  (1) the Tennessee officers had limited information about her criminal history or suspected criminal conduct, and therefore lacked a reason to think she was trafficking drugs; (2) the drugs she possessed were in small, personal quantities, so there was no basis to believe that more would be found in her vehicle; and (3) the Kentucky investigation concerned methamphetamine trafficking, making the discovery of cocaine and psychoactive mushrooms irrelevant.  *See id.* at 6–7.

However, these arguments can be dispatched with relative ease.  The Tennessee officers may have had limited details about the Kentucky investigation, but they knew that Boatright had an outstanding Tennessee arrest warrant for the sale of illicit drugs and that the Kentucky police were actively investigating her for drug trafficking.  *See* DE 54 at 21, 44.  They also knew that Kentucky had an active tracking warrant, a plain signal of probable cause.  Although the Tennessee warrant was relatively dated, it still – when combined with the statements provided by the Kentucky police – reasonably and particularly alerted the officers to the potential that Boatright

20

was transporting illegal drugs. *See id.* at 45. Moreover, the drugs found on Boatright's person did

not reduce that suspicion – rather, they strengthened it. While the quantity found on Boatright's

person is relevant, the mere fact an out-of-state traveler was found in possession of drugs surely

provided ample specific and particularized reason to suspect further criminal activity. *See, e.g.*,

*United States v. Whitley*, 34 F.4th 522, 534 (6th Cir. 2022) (holding that presence of marijuana

residue helped to establish reasonable suspicion sufficient to extend traffic stop). It also justified

follow-up inquiries concerning matters such as vehicle ownership, vehicle status, and the presence

of paraphernalia, additional drugs, or other contraband. *See United States v. Lott*, 954 F.3d 919,

923 (6th Cir. 2020) (noting the parties did not contest defendant's "admission to having marijuana

in the car provided reasonable suspicion" to prolong traffic stop). Finally, Boatright's emphasis

on the kinds of drugs that were found on her person is misplaced. She cannot claim that the

Tennessee officers received minimal information about the Kentucky investigation while faulting

them for failing to rely on the precise details of that investigation during their traffic stop. Because

the officers did not know which drugs were involved in the Kentucky investigation, the discovery

of *any* controlled substance was sufficient to create reasonable suspicion that more controlled

substances would be found in the vehicle.

Second, Boatright asserts that her possession of a firearm was not, in itself, suspicious. In

support, Boatright makes three main points: (1) Tennessee law permits resident and non-resident

individuals who are at least 18 years of age to openly carry legal firearms in a motor vehicle, *see*

TENN. CODE. ANN. § 39–17–1307(e); (2) carrying a firearm in an apparently legal manner cannot

establish reasonable suspicion, *see Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1131–

32 (6th Cir. 2015); and (3) while it is true that Boatright was a convicted felon and unable to legally

possess her firearm, the officers did not know that status at the time they executed the arrest warrant, so that fact is irrelevant. *See* DE 62 at 5–6.

The Court accedes to several of these points. The officers did not seem to know that Boatright was a convicted felon, and her possession of the firearm appeared to generally follow Tennessee law. Yet Boatright overlooks a key point – the reasonable suspicion inquiry is governed by the totality of the circumstances. *See Arvizu*, 122 S. Ct. at 751–52. The firearm may not, on its own, have justified prolonging the stop.[8] But even if lawfully carrying a firearm does not establish reasonable suspicion, carrying a firearm in a manner that suggests it is being used to further a drug trafficking offense certainly does. *See* 18 U.S.C. § 924(c). That is, when considering the drugs found on Boatright's person and the firearm found in her car, together with her outstanding trafficking warrant and the extant Kentucky investigation, there was sufficient evidence to prolong the stop and investigate potential criminal activity via the immediate K-9 open-air sniff. This was not a hunch, but rather, an investigation premised on objective facts. And again, Boatright has little reason to complain about the duration of her detention given that she was immediately arrested under valid process. Delay did not take her across a line between a traffic stop and an illegal detention; she was under arrest from the start of the operative analysis, placing the case beyond the ken of *Rodriguez*.

In summary, the officers had reasonable suspicion of criminal activity. As such, they were permitted to continue the traffic stop in order to conduct an investigation, even after the initial purpose of the stop had been completed. During that investigation, a K-9 gave three quick alerts, providing probable cause to search the vehicle. The officers therefore acted properly, and there was no constitutional invalidity in either the manner of or extent of the traffic stop.

---

[8] Of course, it is illegal, under federal law, for a regular user of controlled substances to possess a firearm in interstate commerce. *See* 18 U.S.C. § 922(g)(3).

### IV.    CONCLUSION

For the stated reasons, the Court **DENIES** Boatright's second suppression motion, DE 26, **ADOPTS**, as modified, Judge Ingram's second recommendation, DE 60, and **OVERRULES** Boatright's second set of objections, DE 62.

However, Boatright's first suppression motion, DE 25, is still active. With respect to that motion, the Court **ORDERS** both parties to file briefs, not to exceed 10 pages, addressing whether the good faith exception spares exclusion in light of the Court's determination that the GPS tracking warrant was unconstitutional. Each brief is due by November 4, 2025.

This the 21st day of October, 2025.

Signed By:

_Robert E. Wier_

United States District Judge